CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
July 22, 2026
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| Kevin Edwards, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:24-cv-00060 |
| | ) | |
| Encompass Community Supports, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

Plaintiff Kevin Edwards brought this action against Defendant Encompass Community Supports f/k/a Rappahannock Rapidan Community Services Board ("Encompass"), alleging retaliation under Title VII of the Civil Rights Act. Edwards worked as a Peer Recovery Specialist at Encompass for a little over four months, from July to November of 2022. While serving in this role, Edwards claims that Patrice Jackson—a supervisor at the recovery center operated by Encompass—treated him in a degrading and hostile manner. In early September, Edwards first notified Encompass management of his concerns. He sent an email to both his supervisor and Jackson alleging that Jackson had previously called him a racist. When his supervisors asked him for an official statement of the encounter, he provided a signed document that complained of several additional interactions with Jackson.

In late September, Edwards submitted his first Discrimination Complaint Form to the Human Resources Department. The complaint alleged that Jackson discriminated against him

because he is white and that Encompass retaliated against him because of his earlier discrimination complaints.  He sent two more internal complaints to Human Resources in October.  Each asserted additional acts of retaliation.  In November, he notified management that he would be filing a charge with the U.S. Equal Employment Opportunity Commission.  On November 30, about a week after Edwards sent his supervisor a link to a website that purported to offer strategy sessions and promote his private recovery services business, Encompass terminated Edwards's employment.  Encompass informed Edwards that he was terminated for violating the organization's ethical policies regarding conflicts of interest and outside employment.

This matter is before the court on Encompass's motion for summary judgment.  (Dkt. 32.)  For the reasons that follow, the court will grant Encompass's motion.

## I.     Background

### A.     Admissibility of Edwards's Declaration

As an initial matter, because Edwards predominantly relies on his "Second Declaration" to argue that genuine issues of material fact exist, the court addresses Encompass's objections to various parts of this declaration.  (Def.'s Reply at 2–11 (Dkt. 36); *see* Second Edwards Decl. (Dkt. 35-3).)  Edwards frequently cites his own 50-page declaration throughout his response brief and when disputing facts proffered in Encompass's initial brief.  Encompass challenges portions of Edwards's "Second Declaration" as containing inadmissible evidence.  (Def.'s Reply at 2–11.)  It asks the court to strike and disregard these excerpts.

Under Federal Rule of Civil Procedure 56(c)(2), at the summary judgment stage, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations filed in opposition to summary judgment generally "must present evidence in substantially the same form as if the affiant were testifying in court." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996). In other words, declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). They also "cannot be conclusory or based upon hearsay." *Evans*, 80 F.3d at 962 (citations omitted).

### 1.    Hearsay Objections

Encompass contends that parts of Edwards's Second Declaration contain inadmissible hearsay. (Def.'s Reply at 4–11.) Under Federal Rule of Evidence 802, "[h]earsay is not admissible" unless a federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court provide otherwise. Fed. R. Evid. 802. Because summary judgment generally requires the parties to present facts in a form that would be admissible in evidence, the court will not consider those statements in Edwards's declaration that are inadmissible hearsay in determining whether there is a genuine dispute of material fact. *See Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251–52 (4th Cir. 1999); *see also* 11 Moore's Federal Practice - Civil § 56.91 (2021) ("Hearsay statements in affidavits, deposition testimony, or interrogatory answers will not be considered [to support an assertion that a fact is or is not genuinely disputed] unless they fall within one of the exceptions to the rule excluding hearsay testimony."). Federal Rule of Evidence 801(c) defines "hearsay" for purposes of Rule 802 as

an out-of-court statement which "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).  On the other hand, "[e]vidence is not hearsay when it is used only to prove that a prior statement was made and not to prove the truth of the statement." *United States v. Ayala*, 601 F.3d 256, 272 (4th Cir. 2010) (cleaned up).

Encompass specifically objects on hearsay grounds to paragraphs 8, 9, 12, 13, 14, 15, 19, 29, 32, 41, 45, 46, 50, 51, 52, 54, 57, 59 of the Second Declaration.  (Def.'s Reply at 4–11.) Generally, these excerpts involve Edwards recounting or quoting prior conversations or email exchanges between Encompass employees.  When he cites these paragraphs of the declaration in his response brief, it is unclear whether Edwards is offering these out-of-court statements in the declaration for the truth of the matter asserted.  (*See* Pl.'s Mem. in Opp. to MSJ at 10–17 (Dkt. 35) [hereinafter "Pl.'s Br."].)  To the extent that these parts of the declaration are introduced to prove the effect of the statements on the listener or that a party had notice of a particular issue, there is no hearsay problem.  *See United States v. Jenkins*, 579 F.2d 840, 842 (4th Cir. 1978).  But if introduced to show the truth of the matter asserted, these statements are generally inadmissible hearsay, unless Edwards can show that they fall within a hearsay exclusion or exception.  *See, e.g.*, *Teeter v. Loomis Armored US, LLC*, No. 7:20-cv-00079, 2021 WL 6200506, at *10–11 (E.D.N.C. Nov. 23, 2021) (holding that plaintiff "may not rely on his account of his coworkers' statements to prove the truth of the matters they assert" without showing that they were non-hearsay or that a hearsay exception applied); *Blanchard v. Arlington Cnty.*, No. 1:21-cv-00649, 2023 WL 2215807, at *5 n.10 (E.D. Va. Feb. 24, 2023), *aff'd*, No. 23-1321, 2023 WL 8064794 (4th Cir. Nov. 21, 2023) ("Plaintiff's recitation [during her deposition]

of what [another employee] told her is inadmissible hearsay and cannot create be relied upon at summary judgment.").

Thus, for the portions of the declaration (1) to which Encompass objects on hearsay grounds, and (2) for which Edwards does not explain how he will be able to offer them in an admissible form, the court will only consider such statements if they are non-hearsay or fall within a hearsay exception—and only if they are relevant[1] and proper.[2]  The court declines to strike these potential hearsay statements in the declaration from the summary judgment record, as some are admissible for non-hearsay purposes.

2.      Additional Objections

Encompass also objects to paragraphs of the declaration as containing improper legal arguments, conclusory statements, opinions, and speculation not based on personal knowledge.  For example, it asks the court to disregard the entirety of paragraph 14 of the Second Edwards Declaration, as it "appears to be directions to [Edwards's] counsel about legal argument."  (Def.'s Reply at 6.)  The court agrees that many excerpts from this paragraph, as well as the identified portions of paragraphs 8, 9, 12, 13, 15, 19, 45, 51, 52, 54, 55, 57, and 59, include conclusory allegations and speculation without a basis for personal knowledge.  The court will disregard these portions as inadmissible.  *See Jones v. Stamper*, No. 1:12-cv-00352,

---

[1] In many instances, the statements Encompass identifies as hearsay are not clearly relevant to the proposition for which Edwards cites the declaration.  For example, to dispute Encompass's facts, Edwards repeatedly cites paragraphs in his declaration that span pages and contain numerous allegations and opinions unrelated to the fact that is purportedly disputed.  (*See, e.g.*, Pl.'s Br. at 13 (citing Second Edwards Decl. ¶ 14).)  In these instances, even if Edwards introduces statements for non-hearsay purposes, the court will still consider Encompass's fact undisputed if there is no relevant, substantive challenge raised by Edwards's declaration.

[2] If the out-of-court statements quoted by Edwards are not based on his personal knowledge, are speculative, or are otherwise inadmissible, the court will disregard the statements for purposes of resolving the summary judgment motion, even if they may be offered for non-hearsay purposes or fall within a hearsay exception.  Encompass objects to many of the same paragraphs as containing both inadmissible hearsay *and* speculation, conclusory assertions, or statements not based on personal knowledge.

2013 WL 6448847, at *2 n.2 (E.D. Va. Dec. 6, 2013), *aff'd*, 567 F. App'x 203 (4th Cir. 2014) ("[E]ven if plaintiff's 'brief' had been sworn, the nonmoving party may not defeat a properly-supported summary judgment motion by simply substituting the 'conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.'" (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990))); *Evans*, 80 F.3d at 962 ("[S]ummary judgment affidavits cannot be conclusory or based upon hearsay." (citations omitted)).

B.     **Factual History**

The following facts are taken from the summary judgment record and, unless otherwise stated, are undisputed.  Edwards states throughout his brief that he "does not dispute" or "does not dispute in part" certain facts, but that these facts are still "misleading" or "incomplete" as set forth in Encompass's brief.  (*See* Pl.'s Br. ¶¶ 11, 12, 14, 18, 25, 27, 29, 33, 35, 36, 45, 48, 52, 57.)  To the extent that Edwards "do[es] not dispute the contents of the asserted fact, but rather suggest[s] that the asserted fact is incomplete, [Edwards] [has] not properly disputed the asserted fact."  *Tsupkp v. Westlake Flooring Co.*, No. 1:24-cv-00360, 2025 WL 2375646, at *3 n.5 (E.D. Va. Aug. 13, 2025); *see Goble v. Lexisnexis Special Servs., Inc.*, No. 1:23-cv-01774, 2025 WL 2380962, at *1 (E.D. Va. Aug. 15, 2025) ("Some of the material facts that Plaintiff attempts to dispute are not actually disputed, however, because Plaintiff merely seeks to provide additional information to supplement or qualify those facts.  This is not a viable method of disputing a material fact on summary judgment."); Fed. R. Civ. P. 56(e)(2) (allowing the court to consider improperly addressed facts as undisputed for the purpose of summary judgment); *Toomer v. Mattis*, 266 F. Supp. 3d 184, 191 (D.D.C. 2017).  Thus, unless noted otherwise, the court treats these "partly disputed" or allegedly "misleading" facts as

undisputed where Edwards does not challenge the contents of the fact. (Def.'s Br. in Supp. of MSJ ¶¶ 12, 13, 15, 19, 26, 28, 30, 34, 36, 37, 46, 49, 53, 58 (Dkt. 33) [hereinafter "Def.'s Br."].) Furthermore, the court considers any additional facts raised by Edwards in his objections to Encompass's "undisputed fact" section, but only if his objections are properly supported by admissible evidence in the record. *See* Fed. R. Civ. P. 56(a).

\* \* \*

Encompass is a "combined area agency and community services board" that was formed in 1972 by the local governments of Culpeper, Fauquier, Madison, Orange, and Rappahannock. (Reinstrom Decl. ¶ 4 (Dkt. 33-1).) Encompass contracts with the Virginia State Department of Behavioral Health and Disability Services to provide a variety of services addressing mental health, substance use, developmental disabilities, and other community needs. (*Id.*) Encompass also operates the "Support, Encourage, Empower" Recovery Center ("the SEE") located in Culpeper, Virginia. (*Id.* ¶ 5.) The SEE hosts recovery-oriented meetings, which are staffed by Encompass employees, including Peer Recovery Specialists. (*Id.*; Will Decl. ¶¶ 5–6 (Dkt. 33-2).)

> 1.    Edwards's Hiring and Orientation

Edwards applied for a Peer Recovery Specialist position at Encompass on June 17, 2022. (Dkt. 33-3 at 2, 8.) In his application, he stated that he was self-employed as the owner and recovery coach for "Unaddictable," an organization that provides "one-on-one and group coaching sessions for [his] clients."[3] (*Id.* at 5, 7.) Edwards was offered the Encompass Peer

---

[3] Edwards's opposition brief appears to contain a typographical error. While he states that "Plaintiff disputes disputes [sic] ¶ 4 of the Defendants Statement of Undisputed Facts," he then proceeds to explain how Encompass's ¶ 5 statement about Will making the decision to hire Edwards is wrong. (Pl.'s Br. at 9.) He does not provide any reasoning as to why ¶ 4 is wrong. Accordingly, the court will treat ¶ 4 as undisputed.

Recovery Specialist position on July 5, 2022.  (Dkt. 33-5 at 1.)  He accepted the position the next day, (*id.*), and his hire date was established as July 11, 2022, (Dkt. 33-6 at 1).

Jackson served as SEE Supervisor during the period relevant to this action.  (Will Decl. ¶ 6.)  In this position, she "ensure[d] that shifts at the SEE were covered by Edwards and other Encompass employees."  (*Id.*)  Rammel served as Peer Recovery Specialist Supervisor and Edwards's direct supervisor.  (*Id.* ¶ 5.)  Will was Rammel's direct supervisor and Edwards's "second-level supervisor."  (*Id.*)  Jackson did not have direct supervisory responsibilities over Edwards, but she was responsible for coordinating with Rammel to ensure that Edwards and other Encompass employees covered the SEE shifts.  (*Id.* ¶ 6.)  Edwards was expected to work one shift per week and one weekend shift per month at the SEE.  (*Id.*)  But Edwards argues that, before filing an internal complaint with the Human Resources Department ("HR"), (First Edwards Decl. ¶ 6 (Dkt. 35-2)), he "routinely worked substantially more," (Pl.'s Br. at 10)—two SEE shifts per week[4] and one SEE shift "every fifth weekend," (Second Edwards Decl. ¶ 8).  He also recounts that he "regularly worked more than ten hours per day," which included "[meeting] participants in the community" and "deliver[ing] harm-reduction kits."  (First Edwards Decl. ¶ 6.)

Edwards was scheduled to receive employee orientation on July 18–19, 2022.  (Dkt. 33-6 at 1; Dkt. 33-7 at 1.)  But since Edwards was ill on July 17, he did not receive the orientation training until August 16, 2022.[5]  (*See* Dkt. 35-1 at 11–14; Second Edwards Decl.

---

[4] The two email exhibits Edwards cites for this proposition only show that Edwards was scheduled to work on Monday, September 12, and Wednesday, August 17—on two isolated weekdays, with nothing about him being assigned to *regular* Monday and Friday weekday shifts.  (*See* Dkt. 35-1 at 2–3.)  His declaration states that he "was working at the SEE on Mondays from 2:00 PM - 10:00 PM [and] Wednesdays from 12:00 PM - 8:00 PM."  (Second Edwards Decl. ¶ 8.)

[5] Encompass asserts that Edwards received his New Employee Orientation on July 18 and 19, whereas Edwards argues that he did not receive it until August 16.  To support its July orientation argument, Encompass points to the fact that,

¶ 9.)    During Edwards's orientation, Encompass reviewed and explained numerous organizational policies, including Policy 304 on "Harassment and/or Discrimination," (Dkt. 33-9), Policy 310 on "Ethics and Conflicts of Interest," (Dkt. 33-10), Policy 313 on "Grievance," (Dkt. 33-11), and Policy 415 on "Other Employment," (Dkt. 33-12).  Edwards signed an HR Policy Acknowledgment on August 16, 2022, which stated that the listed policies, among others, "were explained to [him] during orientation."  (Dkt. 33-8.)

2.    August Email Exchanges

Throughout August, Edwards emailed Will and other Encompass leadership with questions about Encompass's policy on gifts.  First, on August 6, 2022, Edwards emailed Will, Jackson, and Rammel asking for "further clarification" about permissible gift exchanges between Encompass employees and program participants.  (Dkt. 33-13 at 1; Dkt. 35-1 at 15.)  His email included a series of questions about whether peers could give participants cigarettes, face masks, gum, notebooks, cups of coffee, and other "minimal value gifts."  (Dkt. 33-13 at 1–2; Dkt. 35-1 at 15–16.)  Will responded the same day, stating that he would provide a more detailed response "during normal work hours."  (Dkt. 35-1 at 15.)  On August 16, Will responded to Edwards's email with answers to each specific question.  (Dkt. 33-13 at 1.)

On August 24, after Edwards emailed Will with a question about the Encompass gift card policy, (*see* Second Edwards Decl. ¶ 12), Will asked Rammel to "explain to Kevin how to

---

when asked whether the orientation dates of July 18 and 19 "seem[ed] right," Edwards said, "I can't say for sure, but I—it's just been so long, but I believe so."  (Dkt. 36-1 52:3–6.)  This is not sufficient to rebut the email exhibits showing that Edwards notified Encompass staff on July 18 that he had COVID-19 and would not be able to make the New Employee Orientation.  (*See* Dkt. 35-1 at 11–13.)  Also, an email exhibit shows Edwards as a scheduled attendee at the "HR Policies & Introduction to ZERO Suicide" session scheduled for August 16, 2022.  (*Id.* at 14.)

use his supervisor and management," (Dkt. 33-14 at 1).[6]  A few days later, on August 29, Edwards emailed Will asking if he had considered setting up an anonymous online suggestion box, and Will forwarded Edwards's email to Rammel.[7]  (Dkt. 33-15 at 1–2.)  Edwards explains that he sent this suggestion to Will because of "Jackson's behavior towards [him], . . . as well as conversations with co-workers about Jackson's and Rammel's behavior."  (Second Edwards Decl. ¶ 13.)

The next day, on August 30, Edwards emailed Will, Jackson, and Rammel asking whether he could give a participant a "small Red Jasper stone" that was worth $0.78.  (Dkt. 33-17 at 3.)  Rammel responded: "Of course. Why are you asking about .78 cents?"  (*Id.*)  Edwards responded, "Because I want to make sure that I'm following the rules, Daniel."  (*Id.*)  Edwards explained that he believed an official written gifting policy would be helpful.  (*Id.*)  Will responded by forwarding the August 6 guidance on gifts that he had provided via email, directing Edwards to Policy #15, the agency Code of Ethics, and instructing Edwards to direct questions to Rammel.[8]  (*Id.* at 1–2.)  Edwards disputes that he and Rammel had "communication issues."  (Pl.'s Br. at 12.)  But when asked about these August email

---

[6] Edwards asserts that this fact is "incomplete and misleading" because he "was never informed of this directive during his employment and only learned of it through Defendant's document production in discovery."  (Pl.'s Br. at 11.)  Edwards's lack of knowledge about Will's email is not a substantive dispute about whether Will asked Rammel to explain these issues to Edwards.  Accordingly, the fact will be treated as undisputed.

[7] Again, Edwards characterizes this fact as "incomplete and misleading," but he "does not dispute" that he sent this email to Will and that Will forwarded it to Rammel.  (Pl.'s Br. at 12.)  Edwards contends he made this suggestion because of "repeated conduct by Patrice Jackson" and other conduct he observed at SEE, citing his declaration and a nonexistent exhibit.  (*Id.*)  As this only seeks to add facts, the court treats Encompass's proffered fact as undisputed.

[8] Edwards partly disputes Encompass's description of this August 30 email exchange without offering any substantive challenge to the content of the emails.  (Pl.'s Br. at 13–14.)  Furthermore, to the extent that Edwards seeks to add facts about his reason for sending the initial email—"that an employee had been terminated for conduct involving gift exchanges with participants," (*id.*)—he relies on portions of his declaration that are speculative and are not clearly based on personal knowledge.  (*See* Second Edwards Decl. ¶ 15); *Hamstead v. Walker*, No. 3:18-cv-00079, 2020 WL 9720421, at *8 (N.D.W. Va. May 18, 2020) ("A party's mere 'belief' and/or speculation is not based on personal knowledge and is not competent summary judgment evidence.").

exchanges during his deposition, he stated that he and Rammel "were having trouble understanding each other through email."[9]  (Dkt. 36-2 62:11–63:4.)

3.     The Wax Incident and Edwards's Initial Allegations About Jackson

The day after the jasper stone email exchange, on August 31, Encompass hosted an event for International Overdose Awareness Day at the SEE.  (Dkt. 33-1 ¶ 8.)  The employees set up tables with candles.  (*Id.*)  At some point during the event, wax spilled on a tablecloth.  (*Id.*)  On September 2, Edwards emailed Jackson and Rammel encouraging them to watch the video recording to determine who spilled wax on the tablecloth.  (Dkt. 33-18.)  After explaining that he used a cardboard box to prevent wax from getting on the tablecloth, Edwards stated that he would be willing to replace or clean the tablecloth if the video showed that it was his fault.  (*Id.*)  Rammel immediately responded: "I take full responsibility.  No worries."  (Dkt. 33-19.)  Jackson then responded: "Kevin[,] Relax, the tablecloth served it's [sic] purpose and we will handle the cleaning.  Not a big deal, it can be cleaned.  Again, Relax."[10]  (Dkt. 33-20.)  Edwards replied: "Patrice, I'm very relaxed.  What makes you think I'm not?"  (Dkt 33-21 at 1.)  About two hours later, Edwards replied to the email chain again, stating:

> Patrice,
>
> Your assumption about me not being relaxed is inaccurate.

---

[9] Edwards asserts in his Second Declaration that he "sincerely apologize[s] for incorrectly communicating that Rammel and [Edwards] continued to have communication issues when [Edwards] was asked that question during deposition." (Second Edwards Decl. at 21.)  But Edwards "cannot create a dispute about a fact that is contained in deposition testimony by referring to a subsequent affidavit of the deponent contradicting the deponent's prior testimony." *In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011).

[10] Edwards characterizes this fact as "incomplete and misleading" because it "omits the broader context in which this comment was made," but does not make any substantive challenge to the email exhibit and its contents.  (Pl.'s Br. at 14.) This fact will be treated as undisputed.

I started my email with "Good afternoon!", stated some facts, and then ended it with "Have a great weekend!"

Why did I send the email to you and Daniel about the tablecloth?

Well, while I was at the SEE today, you said Tammy is going to flip out if she sees wax on the tablecloth. And the last time I saw an expression on someone's face that was similar to yours when you saw the tablecloth was when my mom found my grandmother dead in her bed. You no longer seemed relaxed, but I didn't make any assumptions, and I didn't tell you to relax.

Also, when I said I didn't get any wax on the tablecloth, Daniel asked me "How do you know that?" as if he didn't believe me. Again, I didn't make any assumptions, but why else would he ask me that question?

Well, there are outdoor security cameras that recorded everything. If he doesn't believe me or if you don't believe me, y'all can watch the recording.

If you see me spill any wax on the tablecloth, please let me know I'll pay for a new one or pay to clean it.

How does offering to pay to clean or replace a tablecloth make me unrelaxed?

Please stop making assumptions about my character and my mood.

I'm one of the most relaxed people on the planet.

I didn't even report it to Cory or HR when you called me a racist in front of other peers, and then referenced my haircut indicating that short hair makes me look like a racist. That's unacceptable behavior (especially for a supervisor), but I'm a very relaxed and forgiving person.

Let's talk in person at the SEE or on a video call since you're inaccurately assuming that I'm not relaxed by reading my emails.

Just let me know what day and time works best for you.

We can even include Cory in this discussion if you think that's a better idea.

I'm fine with whatever you decide.

Have a great night!

(Dkt. 33-22 at 1; Dkt. 35-1 at 29.)

- 12 -

Rammel forwarded the email chain about the wax spill to Will on September 6.  (Dkt. 33-23 at 1.)  Will responded the same day with an email instructing Rammel to (1) send Will all of Rammel's supervision notes from his "one on one supervisions" with Edwards, and (2) "schedule a time with [Edwards] to get an official statement for when he stated that Patrice called him a racist."  (Dkt. 33-24.)  Will also told Jackson that "if [she] know[s] what incident Kevin is referring to," Will needed a statement from her too.  (*Id.*)  Then, that same day, Will emailed Edwards informing him that Will had "begun a preliminary review of the incident to report to Human Resources" and that Edwards was "not to interact with Patrice Jackson . . . either in person, video conference, or in text/teams messages."  (Dkt. 33-25.)  Will also said that Rammel would be contacting Edwards for a statement and that Edwards's shifts at the SEE would be covered until HR provided more guidance.  (*Id.*)

On September 6, Jackson provided a signed statement in response to Edwards's allegations.  In it, she said:

> In reference to Kevin email stating "you called me a racist in front of other peers."  I don't recall making this statement.
>
> In reference to his second statement "then referenced my haircut indicating that short hair makes me look like a racist."  I do not recall making this reference.

(Dkt. 33-29; Dkt. 35-1 at 31.)

On the same day, Edwards emailed Will and Rammel his written statement.  (Dkt. 33-26 at 1–2.)  Edwards also submitted a signed copy of this statement to HR on September 7.  (Dkt. 33-28.)  The two-page statement provides Edwards's account of "what happened before and after Patrice called [him] a racist."  (*Id.* at 2.)  It also recounts this "racist" comment incident—which allegedly occurred on July 15—in more detail than Edwards included in his

September 2 email.  (*Id.*)  In this September 7 statement, Edwards describes the July 15 interaction at the SEE as beginning when, in front of Encompass employee Christina Miller, Jackson asked Miller, "Did you hear that he said I have a stick up my ass?"  (*Id.* at 3.)  The statement alleges:

> Then, Patrice pointed at me and said to [Miller]: "He's a racist."
>
> I said: "I'm not a racist. I dated a black girl for 7 years and have her name tattooed on my chest."
>
> Patrice said: "Listen to him. You hear him trying to justify why he's not a racist?"
>
> I said: "I'm not trying to justify anything. I'm just stating a fact."
>
> Then, Patrice pointed at my head and waved her hand over her head and said: "What's up with that haircut then?"
>
> I said: "My haircut doesn't make me a racist."
>
> Patrice rolled her eyes and smirked.

(*Id.*)

On September 6, Will also forwarded Edwards's statement, Jackson's statement, and the email chain between Edwards, Jackson, and Rammel to Shirley Diaz, Director of HR for Encompass; and Ryan Banks, Senior Director of the Behavioral Health Division for Encompass.  (Dkt. 33-30; *see* Reinstrom Decl. ¶ 16.)  Diaz then informed Jim LaGraffe, Executive Director for Encompass, that she would set up a mediation between Will, Jackson, and Edwards.  (Dkt. 33-30 at 1; *see* Will Decl. ¶ 38.)  The mediation was at one point scheduled for September 16,[11] but Edwards let the group know that he was "experiencing severe

---

[11] Edwards disputes that mediation was initially scheduled for September 16, claiming that it had first been scheduled for September 14, then Will moved it to September 16.  (Pl.'s Br. at 16.)  Regardless of when it was initially scheduled, Edwards does not dispute that he asked to reschedule the September 16 mediation.

- 14 -

symptoms of anxiety and depression" and "need[ed] to take the day off for self-care," as the "whole situation regarding Patrice's behavior toward [him] has been very stressful and overwhelming." (Dkt. 33-31 at 1.) On September 26, Will sent Edwards an invitation rescheduling mediation for September 29. (Dkt. 33-35.)

### 4. Creation of Coaching Memo and PIP

On September 16, Will emailed Banks stating that he "do[es] not want [Edwards] on this team or working within the [Community Services Board]." (Dkt. 35-1 at 35.) Will explained that after reviewing "all the emails [Edwards has] sent, including some of the email chains [Will] was included in or forwarded before his allegation," Will "cannot see a path, no matter what happens in a mediation, where [Edwards is] going to be a productive member of our team and program." (*Id.*) Banks replied that she was already in communication with LaGraffe about Edwards, and that "[Edwards's] time working here will be very short. . . . It is clear that there is no positive path forward." (*Id.*) However, Will proceeded to help Rammel draft a "Coaching Memo" for Edwards because, "[n]otwithstanding Edwards's escalating negative behaviors, [he] decided that the next step would be to support Rammel in attempting to help Edwards meet Encompass's job expectations." (Will Decl. ¶¶ 21–22.)

On September 23, Rammel and Will started to draft the Coaching Memo in response to ongoing communication issues with Edwards. (Dkt. 33-32; *see* Dkts. 33-33, 33-37.) Banks provided feedback on the memo and suggested that there be a Performance Improvement Plan ("PIP") accompanying the Coaching Memo. (Dkt. 33-34.) Rammel and Will also exchanged several emails about how Rammel was "overloaded with Kevin's needs" and how

Will believed Edwards's "responses and demands" were "passive aggressive and combatant."

(Dkt. 35-1 at 53–54.)

          5.      Submission of Discrimination Complaint Form and Additional Internal Complaints

On September 29, Diaz received Edwards's "Discrimination Complaint Form" by certified mail and forwarded it to LaGraffe. (Dkt. 33-36 at 1–2.) Edwards signed the form on September 25, (*id.* at 6), and the Encompass front office received it on September 27, (*see* Dkt. 35-1 at 36–37).[12] Edwards's Discrimination Complaint Form alleges discriminatory actions taken by Jackson on the basis of his "Race/Ethnicity." (Dkt. 33-36 at 2.) It also alleges "acts of retaliation" taken against him "because [Edwards] submitted a discrimination complaint about Patrice Jackson." (*Id.* at 4.) His attachment describes eleven instances of Encompass's alleged retaliation against Edwards. (*Id.* at 15–16.) His form also asks for $39,000, elimination of all contact with Jackson, and a full-time telework schedule as remedies for the alleged discrimination and retaliation. (*Id.* at 5.)

On the same day, September 29, Edwards met with Will, Banks, and Diaz for an attempted mediation. (*See* Will Decl. ¶¶ 24–26; Second Edwards Decl. ¶ 28.) During the mediation, Edwards made the same demand for $39,000 and full-time remote work. (Will Decl. ¶ 26.) At the conclusion of mediation, Will and Edwards agreed to have a follow-up discussion about possible remote work accommodations, as Will explained that a fully remote position was infeasible. (*Id.*)

---

[12] Edwards disputes the fact that Diaz received this form on September 29. (Pl.'s Br. at 17.) Edwards's proffered exhibits show that the Encompass office received the complaint form from USPS on September 27, and Encompass does not appear to dispute this fact. (Dkt. 35-1 at 36–37.) There is no evidence to rebut the email exhibit stating that Diaz personally received the form on September 29. (See Dkt. 33-36.) Thus, there is no factual dispute. For consistency purposes, the court will hereinafter refer to this complaint as the "September 27 complaint."

Rammel met with Edwards on September 30 to discuss the Coaching Memo and PIP. (*See* Dkts. 33-37, 33-38.)  Will emailed Rammel on the same day as the meeting, instructing Rammel to "frame it as the difficulty you're seeing is in the realm of communication.  All of it.  The entire coaching memo and PIP is based on improving the communication cycle." (*See* Dkt. 33-38; Dkt. 35-1 at 20.)  The Coaching Memo referenced the accompanying PIP and noted that Rammel and Edwards "will meet to discuss performance weekly, including lessons learned from the assigned training." (Dkt. 33-37 at 2.)  The PIP document documented that "Communication" and "Conduct" standards of performance were reviewed on September 30. The "Specific examples of current performance under review" section included "Communications with Direct Supervisor," "Back and Forth E-mail Messages," and "Purchases or Decisions Related to his Position." (*Id.* at 3.)

Edwards met with Diaz on October 4, 2022, to discuss his allegations against Jackson. (*See* Dkt. 33-40 at 1; Reinstrom Decl. ¶ 19.)  At the meeting, he provided her with a letter seeking to add "recent acts of retaliation to [his] retaliation complaint." (Dkt. 33-39 at 1.)  The letter contended that the Coaching Memo and PIP, among a list of other incidents, were "acts of retaliation." (*Id.*)  Edwards also sought $47,500 in damages, attributing the increase from his initial $39,000 request to "additional acts of retaliation." (*Id.* at 2.)

On October 3, Edwards requested that Will step in as his supervisor, in place of Rammel.  (Second Edwards Decl. ¶ 37.)  Will emailed Edwards the next day confirming that he would be taking over as direct supervisor.  (Dkt. 33-40 at 1.)  Will began conducting the supervision sessions with Edwards on October 7.  (*See* Dkts. 33-41–33-46.)  During the first

session, Will provided Edwards with a Peer Recovery Services Supervision Agreement, which documented and solidified their weekly supervision plan.  (*See* Dkt. 33-41.)

On October 23, Edwards submitted to Diaz another complaint alleging "more acts of retaliation related to [his] discrimination complaint against Patrice Jackson."  (Dkt. 33-47.) The acts listed in this complaint include three requirements allegedly imposed by Will: (1) Edwards must document his work schedule on his Outlook calendar, (2) Edwards must check in with Will every workday, and (3) Edwards must get permission from Will before working more than 10 hours a day.  (*Id.* at 2.)  Edwards states that, "[d]ue to these additional acts of retaliation, I'm now seeking $60,000 instead of $47,500."  (*Id.*)

On October 25, Diaz emailed LaGraffe an "Investigation Summary Report" addressing Edwards's accusations against Jackson.  (Dkt. 33-48.)  HR had initiated the investigation based on the September 27 Discrimination Complaint Form.  (*Id.* at 1.)  The report included summaries of (1) the mediation meeting with Edwards, (2) Diaz's October 4 meeting with Edwards, (3) Diaz's October 5 meeting with Jackson, (4) Diaz's October 6 meeting with Rammel, and (5) Will's response to Edwards's additional retaliation claims submitted on October 22.  (*Id.* at 1–4.)  In her "Documentation of Findings," Diaz stated that, based on the investigation, she determined that "the allegations of Discrimination Retaliation Complaint by Kevin Edwards is [sic] unfounded," as "the evidence did not support the claim."[13]  (*Id.* at 4.)

---

[13] Edwards disputes the "objectivity and reliability" of the investigation finding that Edwards's allegations were "unfounded."  (Pl.'s Br. at 20.)  He argues that "the Investigation Summary Report was prepared after disciplinary action and pretextual statements had already been initiated and made against Plaintiff."  (*Id.*)  Because he does not dispute that Diaz sent this "Documentation of Findings" and conclusion to LaGraffe, the court treats *the fact that Diaz sent this email with this conclusion* as undisputed.

On October 28, Diaz's employment with Encompass was terminated for unspecified reasons. (Reinstrom Decl. ¶ 21.) Sheryl Reinstrom, Associate Executive Director for Encompass, was assigned the responsibilities of the Director of HR while Encompass sought a replacement. (*Id.* ¶¶ 3, 21.) After assuming these duties, on November 7, Reinstrom initiated a second investigation into Edwards's September 27 Discrimination Complaint Form against Jackson. (*Id.* ¶ 23; *see* Dkt. 33-49 at 2.) According to the November 9 email summary sent to Will, Banks, and LaGraffe after she concluded the investigation, Reinstrom gathered information from Encompass employees Jackson, Rammel, Miller, Nonda Harrington, Angel Ruiz, and Glenn Heath. (Reinstrom Decl. ¶ 23; *see* Dkt. 33-49 at 2–4.) She states that she "called Kevin Edwards to inquire if he had additional information pertaining to the[] specific issues that had not been relayed in his written statements." (Dkt. 33-49 at 4.) Finally, Reinstrom stated her conclusion from the investigation: that she "did not find any evidence of discrimination or harassment." (*Id.*)

Edwards contends that Reinstrom "did not meaningfully gather information from [him]" because she "concluded the investigation . . . without interviewing [him] and without receiving the information she requested from [him] during a phone call on November 7." (Pl.'s Br. at 20 (citing Dkt. 35-1 at 57–62; Second Edwards Decl. ¶ 44).) On November 8, the day after the call and the day before she concluded the investigation, Edwards emailed Reinstrom noting that he was "compiling the information [she] requested" about his complaints, but that he likely would not be able to get it to her that day. (Dkt. 35-1 at 58.) Reinstrom responded saying that she wants Edwards "to forward to [her] what [he] had already sent to Shirley Diaz," as she was "only looking at the issues [he] raised in [his] initial complaint,

any additional issues will be looked at individually." (*Id.* at 57.) Reinstrom emailed Edwards on November 9 to "share with [him] [her] findings in relation to [his] 9/25/2022 Discrimination Complaint against Patrice Jackson." (Dkt. 33-50 at 2.) She concluded that she "do[es] not find the actions [he] ascribed to Patrice Jackson to merit a finding of discrimination." (*Id.*)

On November 14, Edwards notified Reinstrom and other HR personnel via email that he was planning to file charges with the U.S. Equal Employment Opportunity Commission ("EEOC") and Office of Civil Rights ("OCR") if Encompass did not agree to a reasonable settlement. (Dkt. 35-1 at 60.) He stated:

> According to the Civil Rights Act of 1991, I can demand a jury trial since I'm seeking compensatory damages. So, that's what I intend to do if RRCS isn't willing to agree to a reasonable settlement. I've already shared what I'm seeking as a remedy/settlement on the RRCS form titled 'Discrimination Complaint Form' dated 9/25/22.

(*Id.* at 62.)

### 6.     8FOLD Website Issue and Weeks Leading to Termination

Will and Edwards met for a regular supervisory session on November 18. (Will Decl. ¶ 32; *see* Dkt. 33-46.) In this session, they discussed Refuge Recovery, a program that Edwards had agreed to help develop. (*See* Dkt. 33-46; Dkt. 35-1 at 65.) Edwards described what the program might look like to Will.[14] (*See* Will Decl. ¶ 32; *see also* Dkt. 33-51 (listing agenda item of "Discuss Buddhism/Meditation Meeting Framework"); Dkt. 35-1 at 65 (showing email

---

[14] Edwards "disputes" Encompass's statement that the November 18 supervisory session involved "discussion with Edwards about a program that Will had asked Edwards to develop to diversify Encompass's program offerings," in which "Edwards described what the program might look like." (Def.'s Br. at 8; *see* Pl.'s Br. at 21.) But Edwards only seems to rebut the fact that Will asked Edwards to create the program. He does not offer any facts or evidence that contradicts the fact that Will and Edwards discussed the framework and Edwards described what the program might look like to Will.

from Edwards to Will saying, "I'll work on a meeting framework for us to discuss during our next supervision session on 11/18.").)  Additionally, Will informed Edwards that he would sign off on the Coaching Memo as completed, and that his PIP would be removed from his personnel file.[15]  (Will Decl. ¶ 33; *see* Dkt. 33-53 at 1.)  During this session, Edwards also told Will that he was pursuing relief with the EEOC.  (Dkt. 33-52; Second Edwards Decl. at 17.)

On November 21, as a follow-up to their discussion about Edwards helping with Refuge Recovery, which was renamed 8FOLD Recovery, Edwards emailed Will a link to a website that Edwards had developed: www.8foldrecovery.com/see.[16]  (*See* Will Decl. ¶ 34; Second Edwards Decl. ¶ 50; Dkt. 33-54 at 1.)  The website duplicated the content in a website that Edwards had created before his employment with Encompass, which involved a recovery meeting framework called "8FOLD Recovery."[17]  (*See* Dkt. 33-16 152:16–21, 157:15–18; First Edwards Decl. ¶ 28.)  It contained navigation links to "Schedule a free strategy session," "Register For 8FOLD Recovery Meeting," and "unaddictable.com," (Dkt. 33-16 157:15–158:7; Dkt. 33-58 at 1, 3), as well as menu links of "Home," "About," and "Contact," (Second Edwards Decl. ¶ 51).  The bottom of each website page also included the following: "© 2022 Unaddictable, LLC. All Rights Reserved."  (Dkt. 33-58 at 2, 4, 7, 15.)  Unaddictable was a

---

[15] Again, Edwards "disputes" this paragraph of Encompass's statement without offering any substantive rebuttal to the fact that Will informed Edwards of the completed Coaching Memo and PIP.  (Pl.'s Br. at 21–22.)  He merely speculates as to why Will removed the PIP and signed off on the Coaching Memo based on the timing of these actions.  (*Id.*)  The fact that Will informed Edwards of the completion of the PIP and the Coaching Memo will be treated as undisputed.

[16] Edwards "disputes" this fact, but he only rebuts Encompass's statement that Will had specifically requested that Edwards "develop a program."  (Pl.'s Br. at 24.)  Thus, the court only treats the alleged fact that Will asked Edwards to develop a program as disputed.

[17] Edwards disputes this fact, arguing that the website "was not a duplicate of an active website and was not used for private practice or outside employment."  (Pl.'s Br. at 24.)  But Encompass's proffered fact does not state whether the website was active or inactive, or whether it was used for outside employment.  Accordingly, it remains undisputed.

company owned by Edwards.[18]   (Dkt. 33-16 151:22–152:18.)   The site also contained an

existing 8FOLD Recovery email address to which Edwards had access.  (Dkt. 33-58 at 1; *see*

Dkt. 33-16 158:8–11.)

Edwards emphasizes that these 8FOLD and Unaddictable links were not active, and

the link he sent Will was only a "temporary private webpage" that he duplicated from "an

unpublished website that [he] had created years before [his] employment" with Encompass.

(Second Edwards Decl. ¶ 51.)  He explains that he selected "[h]ide from search engines" for

the 8FOLD SEE website, that he only shared the URL with Will, and that navigation links

identified the 8FOLD meetings as "on hiatus."  (*Id.*)  Edwards states that he "never used" the

email account on the page and "never had any incoming or outgoing email from it."  (Dkt. 33-

16 158:11–12.)  That said, Edwards did not explicitly share these details with Will at the time;

in his deposition, Edwards confirmed that he did not inform Will that Will was the only person

with whom the website link had been shared.  (*See id.* 158:13–20.)

After Will received the link and viewed Edwards's website, Will reported his concerns

to Banks and Reinstrom that same day.  (*See* Dkt. 33-54.)  In an email, he provided Banks and

Reinstrom with the website link and the October 28 supervisory session documentation,

explaining:

> This is the second time Kevin has violated our IT Policy and what I find more
> concerning is that on 10-28-22 I help supervision with Kevin and directly asked
> if he was still in private practice, which he denied.  I've attached the signed
> supervision session from that day.  If you go to the above website, you'll see
> that he is still operating Unaddictable LLC and is still offering private practice
> sessions.  As far as I am aware he developed all of this while working on
> company time.

---

[18] Edwards disputes the significance of the copyright message but does not dispute the existence of this message on the website link provided to Will, nor does he dispute his ownership of Unaddictable.  (Pl.'s Br. at 25.)  Thus, these facts are treated as undisputed.

(*Id.* at 1.)  Will then asked Banks and Reinstrom for advice on how to proceed.  (*Id.*)

Will and Edwards had previously discussed Encompass policy surrounding employee engagement in private practice at their October 28 supervisory session.  (*See* Dkt. 33-44; Dkt. 33-16 128:8–11.)  At that session, Edwards told Will that he was not engaged in private practice.  (Will Decl. ¶ 34.)

On November 28, Reinstrom asked Will to speak with Edwards about the website and why it is copyrighted.  (Dkt. 35-1 at 68.)  Will responded that he looked up the Unaddictable website and the site was in Edwards's name and owned by Edwards.  (*Id.*)  Will also relayed to Reinstrom that Edwards had denied that he was engaged in private practice.  (*Id.*)

On November 30, Will, Reinstrom, and Edwards met.  (Will Decl. ¶ 38.)  At the meeting, Edwards explained that there was no conflict of interest because he did not have other employment, explained that he had provided the information upon Will's request, and demonstrated on his phone that the website was no longer published.  (Second Edwards Decl. ¶ 58.)  Reinstrom issued Edwards a written notice of a "Group III" Encompass policy violation.  (*See* Dkt. 33-55.)  This notice terminated Edwards's employment with Encompass. (*Id.* at 2.)  The reasons for termination provided in the notice were the alleged violations of Encompass's Ethics and Conflicts of Interest Policy (310) and Other Employment Policy (415)—specifically, "Kevin's ongoing conflict of interest, and the use of proprietary and/or confidential information for personal gain (his own copy righted LLC)."[19]  (*Id.* at 1–2.)

---

[19] Edwards disputes this fact on the grounds that "[t]he stated reasons for Plaintiff's termination are false and unsupported by the evidence."  (Pl.'s Br. at 29–30.)  But Encompass's undisputed fact section only asserts that these were the reasons for termination *that Encompass provided to Edwards*, not that Edwards *in fact violated* these policies.  Edwards does not point to any facts or evidence to undercut Encompass's assertion that these were the reasons provided to Edwards for his termination.  (*See* Def.'s Br. ¶ 59; Dkt. 33-55.)  The court will treat this fact as undisputed.

Edwards filed an EEOC charge of discrimination several months later, on February 8, 2023.  (Compl. ¶ 7 (Dkt. 1-1); First Edwards Decl. ¶ 36.)  In it, he alleged that the Defendants "retaliated against him for engaging in protected activity in violation of Title VII."  (Compl. ¶ 7.)  He received his EEOC right-to-sue letter on November 13, 2023.  (*Id.* ¶ 8.)

### C.    Procedural History

On February 12, 2024, Edwards filed a complaint in the Circuit Court for Fairfax County, alleging that Encompass retaliated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  (Dkt. 1-1.)  Specifically, Edwards alleges that he engaged in protected activity when he complained to Encompass's HR Department, which then caused Encompass to unlawfully retaliate against him.  (*Id.* ¶¶ 22–25.)  Edwards seeks compensatory damages of $300,000, punitive damages of $300,000, lost wages and benefits exceeding $50,000, and other fees and costs.  (*Id.* at 5.)  Encompass was served with the complaint on June 10, 2024.  (Dkt. 1 ¶ 2.)  On July 1, Encompass answered the complaint and filed a motion to transfer venue to the Circuit Court for Culpeper County.  (Dkts. 1-2, 1-3.)

On July 9, 2024, Encompass timely removed the case from Fairfax County Circuit Court to the U.S. District Court for the Eastern District of Virginia.  (Dkt. 1.)  Encompass moved to transfer venue to the Western District of Virginia on July 19, 2024.  (Dkt. 3.)  Several weeks later, the parties filed a consent motion to transfer the case to the Western District of Virginia, (Dkt. 7), and United States District Judge Anthony J. Trenga granted the motion, (Dkt. 8).  The case was transferred to this court.  (Dkt. 9.)

On January 9, 2026, Encompass moved for summary judgment.  (Dkt. 32.)  Edwards responded in opposition to summary judgment on January 30.[20]  (Dkt. 33.)  Encompass replied in support of their motion on February 6.  (Dkt. 36.)  On April 29, 2026, the court ordered supplemental briefing on whether Edwards's internal retaliation complaints constitute protected opposition activity under Title VII.  (Dkt. 38.)  The parties each filed a supplemental brief on May 20.  (Dkts. 39, 40.)

## II.      Standard of Review

Under Federal Rule of Civil Procedure 56(a), the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted).  Furthermore, a dispute is only "genuine" if there is sufficient evidence such that "a reasonable jury could return a verdict for the non-moving party."  *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022); *Anderson*, 477 U.S. at 249–50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (citations omitted)).  To grant a Rule 56 motion for summary judgment, the court "must determine that no reasonable jury could find for the nonmoving party on the evidence before it."  *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990).

---

[20] The court granted Edwards's consent motion for extension of time to file a response and deemed the brief in opposition timely filed.  (Dkts. 34, 37.)

The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). In determining whether a genuine issue of material fact exists, the court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

Generally, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). That said, the court need only view the facts in the light most favorable to the nonmoving party if there is a "genuine" dispute as to those facts. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *see Scott v. Harris*, 550 U.S. 372, 380 (2007); Fed. R. Civ. P. 56(c). To survive summary judgment, the nonmoving party must "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). It may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75, 884 (4th Cir. 1992).

### III.   Analysis

Title VII prohibits employment discrimination based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). Title VII's antiretaliation provision, 42 U.S.C.

- 26 -

§ 2000e–3(a), seeks to protect this core antidiscrimination provision by "preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).

Edwards contends that Encompass took adverse actions, leading up to and including his termination, with retaliatory intent. (Compl. ¶¶ 13–14, 18.) Where, as here, the plaintiff has not produced direct evidence of Encompass's retaliatory intent, he can still prove his Title VII retaliation claim through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kelly v. Town of Abingdon,* 558 F. Supp. 3d 289, 301–02 (W.D. Va. 2021). To establish a *prima facie* case of retaliation, Edwards must show that "(1) [he] engaged in a protected activity; (2) the employer acted adversely against [him]; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Strothers v. City of Laurel*, 895 F.3d 317, 327–28 (4th Cir. 2018) (quoting *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008)). Once the plaintiff has made his *prima facie* showing, the burden shifts to the employer "to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). Then, the burden shifts back to the employee-plaintiff "to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination." *Id.* (cleaned up).

Even when drawing all inferences in Edwards's favor, Encompass has successfully shown that it is entitled to summary judgment on Edwards's single retaliation claim. Because no genuine issue as to any material fact remains for the protected activity element, Edwards

- 27 -

cannot make out a *prima facie* case of retaliation, and no reasonable jury could find in Edwards's

favor.  Accordingly, the court will grant Encompass's motion for summary judgment.

### A.     Protected Activity

"Title VII protects the right of employees to . . . complain to their superiors about

suspected violations of [the statute]."  *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543–

44 (4th Cir. 2003).  An employer is prohibited from retaliating against an employee who

engages in two categories of activity: (1) "oppos[ing] any practice made an unlawful

employment practice" by Title VII, often referred to as "opposition activity"; and (2)

participating "in any manner in an investigation, proceeding, or hearing" under Title VII, or

"participation activity."  42 U.S.C. § 2000e–3(a); *see EEOC v. Navy Fed. Credit Union*, 424 F.3d

397, 406 (4th Cir. 2005).

Protected participation activity includes filing a charge of discrimination with the

EEOC, as well as testifying or assisting with such matters.  42 U.S.C. § 2000e–3(a).  Because

Edwards did not file his EEOC charge of discrimination until February 2023, (Compl. ¶ 7)—

months after Encompass terminated his employment, (*id.* ¶ 18)—this charge could not have

constituted participation activity forming the basis of his retaliation claim.[21]  *See Adams v. High*

*Purity Sys. Inc.*, No. 1:09-cv-00354, 2009 WL 2391939, at *7 n.6 (E.D. Va. July 2, 2009), *aff'd*,

382 F. App'x 269 (4th Cir. 2010) (holding that the plaintiff "cannot allege participation

activity" because his "employment was terminated before he filed his EEOC Charge of

Discrimination," and "therefore any retaliation necessarily occurred before his participation in

---

[21] In his supplemental summary judgment brief, Edwards suggests that his November statement that he intended to file an EEOC charge falls within Title VII's "participation clause."  (Pl.'s Supp. Br. at 10–11 (Dkt. 39).)  However, he cites no cases showing that the mere expression of an intent to file a charge, where the charge was not actually filed until months later, constitutes protected participation activity.

any EEOC investigation"); *Peterson v. Northrop Grumman Sys. Corp.*, No. CV WMN-13-3812, 2015 WL 6783161, at *3 (D. Md. Nov. 5, 2015) ("Plaintiff's conduct does not fall within the scope of the participation clause because he did not file an EEOC charge until after he was terminated nor did he assist with any EEOC charge, investigation, proceeding, or hearing during his employment."); *see also Stennis v. Bowie State Univ.*, 716 F. App'x 164, 167 (4th Cir. 2017) (unpublished per curiam decision) (noting that "[e]very Court of Appeals to have considered th[e] issue squarely has held that participation in an internal employer investigation not connected with a formal EEOC proceeding does not qualify as protected activity under the participation clause").  Edwards does not allege any earlier participation in a formal EEOC proceeding in his complaint, nor does he even assert participation activity as the basis for his claim in his summary judgment response brief.[22]

"Thus, the Court's analysis is limited to whether Plaintiff opposed an unlawful employment practice" through protected *opposition* activity.  *Bales v. Cnty. of El Dorado*, No. 2:18-cv-01714, 2020 WL 6684696, at *3 (E.D. Cal. Nov. 12, 2020).  Unlike participation activity, this protected *opposition* activity need not be part of a formal proceeding to trigger Title VII protections.  *See Strothers*, 895 F.3d at 328 n.4.  Opposition activity "can take numerous forms," such as "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Id.* (quoting *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998)).  Emailing

---

[22] Edwards states in his declaration that he had filed a "complaint" or online "inquiry" with the EEOC and OCR in early October 2022. (*See* Second Edwards Decl. at 17; Dkt. 33-16 144:10–15.)  But this cannot constitute protected participation activity forming the basis of Edwards's retaliation claim because he does not allege he made this filing in his complaint. *See Barclay White Skanska, Inc. v. Battelle Mem. Inst.*, 262 F. App'x 556, 563 & n.16 (4th Cir. 2008) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.") (citations omitted).  And he provides no documentation to show his participation in an October EEOC investigation or proceeding.

a signed complaint to HR, submitting various discrimination complaint forms to HR, and sending email complaints to supervisors generally constitute "complain[ts] to superiors" made through informal grievance procedures, *Strothers*, 895 F.3d at 328, such that Edwards's actions resemble common *forms* of opposition activity.

Even so, to be protected, opposition activity must also be "a response to an employment practice that is, or that the plaintiff reasonably believes is," unlawful under Title VII. *Pettis v. Nottoway Cnty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014); *see also Laughlin v. Metro. Washington Airports Auth.*, 952 F. Supp. 1129, 1133 (E.D. Va. 1997), *aff'd*, 149 F.3d 253 (4th Cir. 1998) (holding that "while the 'participation' clause covers a narrower range of activities than the other, it gives those activities stronger protection than the 'opposition' clause provides"). "Title VII is not a general bad acts statute, . . . and it does not prohibit private employers from retaliating against an employee based on [his] opposition to discriminatory practices that are outside the scope of Title VII." *Bonds v. Leavitt*, 629 F.3d 369, 384 (4th Cir. 2011).

An employee's "reasonable belief" is measured under both a subjective and objective standard. "Workplace complaints are only protected by Title VII if a plaintiff can show: (1) a subjective, good faith belief that the employer was violating Title VII; and (2) that the belief was objectively reasonable in light of the facts." *Jefferies v. Westinghouse Elec. Co.*, No. 3:14-cv-01317, 2015 WL 13733721, at *8 (D.S.C. Nov. 9, 2015) (citing *Peters v. Jenney*, 327 F.3d 307, 321 (4th Cir. 2003)); *see David v. Winchester Med. Ctr.*, No. 5:16-cv-00063, 2018 WL 310140, at *16 (W.D. Va. Jan. 5, 2018), *aff'd*, 759 F. App'x 166 (4th Cir. 2019) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam)); *Workman v. LHC Group, Inc.*, No. 1:23-cv-

- 30 -

00048, 2025 WL 474923, at *3 (W.D. Va., Feb. 12, 2025) ("[W]hile a plaintiff's claim that unlawful conduct occurred need not be meritorious, it must be reasonable." (cleaned up)). The allegedly unlawful employment practice need not be a completed Title VII violation at the time the plaintiff opposes it to give rise to protected activity. Rather, the violation "may be in progress." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015). In other words, the employee must have an objectively reasonable belief that a Title VII violation "had occurred or was occurring." *Peters*, 327 F.3d at 320.

Edwards argues that his "repeated[] complain[ts] to management and Human Resources" constitute protected opposition activity. (Pl.'s Br. at 33.) In his response to Encompass's summary judgment motion, Edwards only specifically cites his September 2 email and his November 18 statement to Will when discussing protected opposition activity. (*See id.* at 15, 23, 33.) But in his initial state court complaint, Edwards alleges that he made additional internal complaints to Encompass. (*See* Compl. ¶¶ 13, 15.) Thus, the court will analyze whether any of the following complaints contained in the summary judgment record constitute protected opposition activity for Edwards's retaliation claim:

> (1) Edwards's September 2 follow-up email sent to Jackson and Rammell, (Pl.'s Br. at 15; Dkt. 33-22);
>
> (2) his September 7 complaint sent to the HR Department on September 7, 2022, (*see* Compl. ¶ 13; First Edwards Decl. ¶ 16; Dkt. 33-28 at 2–3), which was also emailed to Will and Rammel on September 6, (*see* Dkt. 33-26);
>
> (3) his September 27 "Discrimination Complaint Form," (*see* Compl. ¶ 15; Dkt. 33-36);
>
> (4) his October 4 retaliation complaint, (*see* Compl. ¶ 15; Dkt. 33-39);
>
> (5) his October 23 retaliation complaint, (*see* Compl. ¶ 15; Dkt. 33-57 at 5–6);

(6) his November 14 email to Reinstrom stating that he intended to file an EEOC charge if Encompass did not provide the compensation he requested, (*see* Compl. ¶ 16; Dkt. 35-1 at 60–62); and

(7) his November 18 statement to Will that he intended to file an EEOC charge, (*see* Compl. ¶ 17; Def.'s Br. ¶ 49; First Edwards Decl. ¶ 30; Dkt. 33-52).[23]

Encompass first argues that, for each of his statements or internal complaints, Edwards did not have a subjective, good-faith belief that Encompass was engaged in an unlawful employment practice. As evidence, Encompass points to the fact that Edwards waited to report Jackson's alleged behavior until after Will prompted him to do so, even though Edwards had recently been informed during his orientation that he should report any such allegations to HR. (*See* Def.'s Br. at 14–15 (citing Dkt. 33-26; Dkt. 33-16 75:4–9, 81:8–13; Dkt. 33-22).) Encompass also underscores Edwards's deposition testimony that the purpose of his initial September 2 email "was to have a conversation with [Jackson] to see if [they] could resolve this so [Edwards] could stop feeling how [he] was feeling at work." (Dkt. 33-16 82:8–10.)

The court finds that there is at least a genuine issue of material fact as to whether Edwards subjectively and in good faith believed that he was being discriminated against or subjected to a hostile work environment because he is white. Edwards's delay in reporting Jackson's alleged wrongful conduct does not preclude the possibility that he had a subjective, good faith belief that Encompass was committing a Title VII violation. (*See* Dkt. 33-22 at 1 (Edwards reporting Jackson's statements about his haircut in his September 2 email, describing

---

[23] The court uses the dates specified in Edwards's complaint—October 4 and 23—to identify his October complaints, even though these dates do not match the dates contained in Encompass's corresponding exhibits. (*See* Dkts. 33-39, 33-57 (showing retaliation complaints dated October 2 and October 22 rather than October 4 and October 23).) Additionally, because Edwards does not oppose Encompass's exhibits as inaccurate depictions of these October complaints, the court will consider Dkts. 33-39 and 33-57 as his two internal October complaints.

this as "unacceptable behavior," but explaining that he did not report it to Will or HR because he is a "relaxed and forgiving person").)

Encompass points to cases where the court discussed an employee's delay in reporting a potential Title VII violation. But the only cases Encompass cites are those where the court relied on the delay to determine the applicability of the "*Faragher/Ellerth* affirmative defense." (*See* Def.'s Br. at 14–15, 15 n.4 (citing *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 267 (4th Cir. 2001); *Boyer-Liberto*, 786 F.3d at 282).) Encompass does not raise such a defense in this case, as it is not applicable to Edwards's retaliation claim. *See O'Connor v. Cameron*, No. CV DKC 17-3394, 2019 WL 1112281, at *7 (D. Md. Mar. 11, 2019) ("[*Faragher-Ellerth*] is not a defense to a retaliation claim brought pursuant to 42 U.S.C. § 2000e-3."). Nor does Encompass provide, and the court does not find, any cases using evidence of delayed reporting to find the plaintiff did not, as a matter of law, have a subjective belief that a Title VII violation was underway. Moreover, the fact that Edwards wanted to have a conversation with Jackson and resolve the dispute does not foreclose the possibility that he, in good faith, believed that he was being discriminated against.

But a subjective belief alone is not sufficient to establish protected opposition activity. For his internal discrimination complaints to constitute protected activity, Edwards must also hold an *objectively reasonable* belief that Encompass was engaged in racially discriminatory employment practices. *See Westinghouse Elec. Co.*, 2015 WL 13733721, at *8. In determining whether Edwards had an objectively reasonable basis to oppose what he perceived to be his employer's Title VII violations, the court must consider the elements of the applicable Title VII claims in light of what Edwards knew at the time. *See Strothers*, 895 F.3d at 328.

- 33 -

The unlawful activity that Edwards initially claims to have opposed is Jackson's "discriminatory and hostile" conduct. (Pl.'s Br. at 15.) "Because [Edwards] was complaining about [Jackson's] actions, [Edwards's] statements may be protected from retaliation only if [Jackson's] actions were either actually unlawful under Title VII or [Edwards] could reasonably believe they were unlawful under Title VII." *David*, 2018 WL 310140, at \*17. For each of Edwards's internal complaints, the court must determine "whether a jury could find that [Edwards] reasonably believed" when he made such reports that (1) a hostile work environment based on Edwards's race existed or was in progress, or (2) Jackson had discriminated against Edwards because he is white. *Boyer-Liberto*, 786 F.3d at 285. Viewing the facts in a light most favorable to Edwards, a reasonable jury could not find that Edwards reasonably believed he was being subjected to a hostile work environment or discrimination based on his race.

1.    September 2 Email

First, Edwards's assertion that the September 2 email to Jackson and Rammel constitutes protected opposition activity is an attempt to improperly amend his complaint. (*See* Pl.'s Br. at 15, 33.) Edwards did not include any allegations about this September 2 email in his complaint. (*See* Dkt. 1-1.) For the first time, in his response to the motion for summary judgment, he relies on this communication as an instance of protected opposition activity. Edwards may not amend his complaint through assertions in his summary judgment opposition brief. *See Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 563 & n.16 (4th Cir. 2008) (unpublished per curiam decision). Therefore, the September 2 email cannot constitute protected opposition activity for Edwards's retaliation claim.

- 34 -

2.      September 7 Statement

Next, Edwards's September 7 complaint is not protected opposition activity because it does not adequately inform Encompass that Edwards is complaining of racial discrimination or conduct made unlawful by Title VII.

"Although Title VII does not protect general complaints of unfair treatment, an employee's complaint constitutes protected activity when the employer understood, or should have understood, that the plaintiff was opposing discriminatory conduct." *Hemphill v. United Parcel Serv., Inc.*, 975 F. Supp. 2d 548, 560 (D.S.C. 2013) (cleaned up) (quoting *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012)). "An employee's belief that a Title VII violation has occurred may be completely reasonable, but if she fails to tie complaints about workplace conduct to her protected status, the employer could not have retaliated for engaging in a protected activity." *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 412 (4th Cir. 2022). Thus, for Edwards's internal complaint to constitute protected activity, it must be that, based on the substance of his complaint, Encompass understood or "should have understood" that Edwards "was opposing discriminatory conduct" based on his protected status. *Burgess*, 466 F. App'x at 282.

Edwards's September 7 complaint to HR does not include any express reference to racial discrimination or a hostile work environment arising from racial discrimination. (*See* Dkt. 33-28.) Rather, Edwards provides his account of several interactions with Jackson and conveys his grievances with Jackson's labeling him a "racist"; calling out his haircut; and "body language," "facial expression[s]," and "behavior" in such interactions, characterizing them as "heated[]," "trying to flex," "degrad[ing]," and "malicious." (Dkt. 33-28 at 2–3; *see* Dkt. 33-22

- 35 -

at 1.)  Edwards alleges in his operative complaint, initially filed in Virginia state court, that his

September 7 internal complaint to Encompass "stat[ed] that he believed he was being harassed

because of his race (white)."  (Dkt. 1-1 ¶ 13.)  But in the exhibits depicting this September 7

internal complaint, (Dkts. 33-26, 33-28), Edwards does not once mention that Jackson took

these actions based on his race.[24]  *See Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir.

2020) ("Once the movant has made this threshold demonstration [that there is no genuine

issue of material fact], the nonmoving party, to survive the motion for summary judgment,

may not rest on the allegations averred in his pleadings.").

On its face, Edwards's September 7 complaint fails to put Encompass on notice that

Edwards was complaining about unlawful race discrimination.[25]  Accordingly, even when

construing all facts in a light most favorable to Edwards, it does not suffice to show Edwards

engaged in protected opposition activity.  *See Hemphill*, 975 F. Supp. 2d at 562 (concluding that

plaintiff's email to her HR manager was not protected opposition activity because her

"allegations that she was being treated unfairly, had been spoken to in a very . . . degrading

manner, had been verbally threatened about her job and her life, and had been openly

embarrassed and humiliated" "did not make any reference to discriminatory treatment based

on race or sex" (cleaned up)); *Gray v. Walmart Stores, Inc.*, 7:10-cv-00171, 2011 WL 1831780, at

*7 (E.D.N.C. May 12, 2011) (holding that plaintiff's internal complaints were not protected

opposition activity in part because the complaints made "no mention whatsoever of racial

---

[24] As the court explains further in Subsection III.A.2.i, making statements accusing someone of being a racist does not, alone, constitute discrimination on the basis of race.

[25] Edwards's September 2 complaint is similarly devoid of any allegations of discrimination or race-based hostility.  Thus, even if Edwards had alleged the September 2 email as protected activity in his complaint, it would still fail to meet the Title VII definition of protected activity.

discrimination"); *Wehunt v. R.W. Page Corp.*, 352 F. Supp. 2d 1342, 1358 (M.D. Ga. 2004) ("It is not enough to simply complain in a racially neutral way about an employer's practices, and then expect the employer to speculate as to whether such complaints may be motivated by an employee's subjective and undisclosed belief that the employer was engaged in race discrimination."); *see also Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 282 (4th Cir. 2000) ("Law does not blindly ascribe to race all personal conflicts between individuals of different races."); *Evans v. Md.-Nat'l Cap. Parks & Plan. Comm'n*, No. CV MJM-19-2651, 2023 WL 3328002, at *25–26 (D. Md. Mar. 31, 2023), *aff'd*, No. 23-1475, 2023 WL 8064797 (4th Cir. Nov. 21, 2023) (finding that an internal complaint that does not "allege racial discrimination or even mention Plaintiff's race" was not protected activity, even where employer's subsequent investigation examined potential racial discrimination).

3.     Discrimination Complaints: September 7 Statement and September 27 Complaint Form

Because Edwards did not have an objectively reasonable belief that he was being discriminated against because of his race, none of Edwards's September complaints can be classified as protected opposition activity under Title VII.  Edwards does not show that any genuine issues of material fact exist as to whether he had an objectively reasonable belief that (1) a Title VII racial discrimination violation was in progress, or (2) a Title VII racially hostile work environment was in progress.  The court will address the lack of an objectively reasonable belief for these two potential Title VII claims in turn.

i.     *Reasonableness of Belief: Racial Discrimination Claim*

Edwards did not have an objectively reasonable belief that he was subjected to Title VII racial discrimination at the time that he filed either of the September complaints.  First,

when asked why Jackson's behavior led him to believe that he was being discriminated against based on his race, Edwards admits that his belief arose simply because "there's no other reason for it because [he] hadn't done anything." (Dkt. 33-16 93:13–18.) He concludes that "the only logical reasoning is that it was because of [his] race and the color of [his] skin," without pointing to any aspect of Jackson's behavior or specific statement suggesting that she was discriminating on the basis of race, or any evidence that Jackson treated people of a different race differently. (*Id.* 93:19–20); *see Diamond v. Morris, Manning & Martin, LLP*, 457 F. App'x 844, 846 (11th Cir. 2012) (finding plaintiff's belief that she was racially discriminated against objectively unreasonable because she offered no evidence that employees outside her race were treated differently); *Perry v. Kappos*, 776 F. Supp. 2d 182, 196 (E.D. Va. 2011) (holding that the plaintiff did not have objectively reasonable belief that discrimination occurred when plaintiff failed to offer any examples of how other employees in similar situations were treated differently or any other evidence corroborating his allegations). Edwards cannot rely solely on his own opinion. He "must point to specific evidence in the record from which a jury could infer that a reasonable person in [his] shoes would have believed that [his] complaints related to an ongoing Title VII violation." *Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 719 (4th Cir. 2024) (cleaned up).

To show that he had an objectively reasonable belief of Title VII discrimination, Edwards almost exclusively relies on the fact that he "was publicly labeled a 'racist' from a supervisor." (Pl.'s Br. at 34.) Both September complaints include Edwards's accusation that Jackson called him a racist in front of other coworkers and then referenced his haircut, implying that the haircut makes him look like a racist. (*See* Dkt. 33-28 at 3; Dkt. 33-36 at 13;

Dkt. 35-1 at 48.)  Although the concept of racism is *related* to race, courts have repeatedly held that "discrimination on the basis of alleged racism is not the same as discrimination on the basis of race," such that statements suggesting someone is racist "do[] not indicate that the object of the statement is being rejected because of his race." *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013); *see Squitieri v. Piedmont Airlines, Inc.*, No. 3:17-cv-00441, 2018 WL 934829, at *3 (W.D.N.C. Feb. 16, 2018) ("[S]tating that Plaintiff is 'racist' is not racial on its face and is not related to Plaintiff's race."); *see also Byrnes v. City of Hattiesburg*, 662 F. App'x 288, 291 (5th Cir. 2016) ("Harassing someone because he is a racist (or the son of one) is not the same as harassing someone because of his race. . . . [M]erely observing that [plaintiff] is Caucasian and [the individual calling the plaintiff's father racist] is African American is not enough to support a claim for race-based harassment."); *Manco v. St. Joseph's Univ.*, No. CV 22-285, 2024 WL 299265, at *5 (E.D. Pa. Jan. 25, 2024) (collecting cases holding that "being falsely perceived as racist is not a protected characteristic under anti-discrimination laws"); *Huynh v. O'Neill*, No. Civ. A. 3:01-cv-00445, 2002 WL 32507837, at *5 (E.D. Va. May 29, 2002) ("Although the comments and actions the Plaintiff alleges were unwelcome, there is simply no basis to conclude that they were racially-motivated or even motivated by anything more than intra-office conflict among individuals who did not like each other."). Edwards's ignorance of this law "cannot create objective reasonableness." *Cyr v. Perry*, 301 F. Supp. 2d 527, 535–36 (E.D. Va. 2004); *see Harper v. Blockbuster Ent. Corp.*, 139 F.3d 1385, 1388 n.2 (11th Cir. 1998) ("If the plaintiffs are free to disclaim knowledge of the substantive law, the reasonableness inquiry becomes no more than speculation regarding their subjective knowledge.").

Furthermore, it is not reasonable to believe that Jackson's reference to Edwards's haircut exhibits racial animosity or discrimination against Edwards because he is white. *See King v. E. Shore Water*, LLC, No. CIV. SKG-11-1482, 2012 WL 3155647, at \*21 (D. Md. July 31, 2012) ("[E]ven if the comments about plaintiffs' hair were somehow connected to a stereotype about African American women's hair (a connection which, again, plaintiffs have not asserted and the Court does not understand), the comments do not evidence racial animosity or hatred."); *Mixon v. Charlotte-Mecklenburg Schs.*, No. 3:11-cv-00228, 2011 WL 5075808, at \*6 (W.D.N.C. Aug. 5, 2011), *report and recommendation adopted*, 2011 WL 5075622 (W.D.N.C. Oct. 26, 2011), *aff'd*, 473 F. App'x 271 (4th Cir. 2012) (finding no protected opposition activity where "alleged comments about Plaintiff's hair and weight neither explicitly nor implicitly referred to race or any other protected category"). Edwards's filings do not explain how this "haircut" comment is related to racial animosity, discrimination or harassment such that his belief that he was subjected to racial discrimination was objectively reasonable.[26] And "[t]he most obvious measure of the objective reasonableness of a plaintiff's belief that the conduct of which he complained violated Title VII is the state of the case law at the time the plaintiff engaged in the protected activity." *Mayo v. Kiwest Corp.*, No. 95-2638,

---

[26] For similar reasons that Jackson's alleged "haircut" comment to Edwards does not convey racial discrimination or harassment, alleged statements made by Edwards's coworker Debra Bost to Edwards do not give Edwards an objectively reasonable belief that Jackson was discriminating against him because he is white. (*See* Second Edwards Decl. ¶ 9.) Bost allegedly told Edwards that Jackson (1) asked Bost why people call Bost's hair dirty blonde and (2) called Bost and her son "you people." (*Id.*) First, the alleged statements to Bost are not clearly race-related. In fact, Edwards does not even specify Bost's race. Second, Edwards's statement in his declaration that Bost told him that Jackson is a racist does not suffice to give Edwards an objectively reasonable belief that she was racially discriminating against him. *See Espinoza v. Dep't of Corr.*, 509 F. App'x 724, 733 (10th Cir. 2013) (unpublished) (finding that the "opinions and feelings of other employees," including a co-worker's statements that the supervisor's aggressive actions were racially motivated, did not contribute to an objectively reasonable belief that plaintiff was being discriminated against).

1996 WL 460769, at *4 (4th Cir. Aug. 15, 1996), (unpublished table decision), *overruled on other grounds by Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998).

The September complaints describe additional interactions between Edwards and Jackson spanning from mid-July through mid-August 2022. (*See* Dkt. 33-28 at 2–3.) Most of the interactions, as conveyed in Edwards's complaint, do not involve any implicit or explicit reference to race, nor do they allege racial discrimination against Edwards. The September 7 allegations include:

> (1) A July 11 or 12 conversation between Jackson and Edwards about gun policy, in which Jackson became "offended/irritated that [he] didn't express agreement with her gun policy opinion," and "her facial expression and body language made it very clear that she wasn't pleased with [him]";
>
> (2) Edwards asked Jackson on July 13 whether she "kn[ew] what [he was] talking about" when he described the difficulty of "working with people that act like they have a stick up their ass," and Jackson allegedly responded asking Edwards and the other employees in the room whether he had just said Jackson "ha[s] a stick up [her] ass";
>
> (3) That same day, Edwards asked Jackson where she is from and she "proceeded to heatedly explain how her hometown was more country than Culpeper and that [Edwards] should go ask Gaelen the definition of a redneck and then come back to her to compare his definition of a redneck with her definition of a redneck";
>
> (4) The July 15 exchange in which Jackson pointed at Edwards and said to Christina Miller, "[h]e's a racist," and then, when Edwards denied that he was a racist, Jackson "pointed at [his] head . . . and said: 'What's up with that haircut then?'";
>
> (5) Jackson told Edwards, a few weeks before September 7, to "[w]ait right there, young man" in front of other employees in an "attempt to degrade" him;
>
> (6) Soon after, Jackson said to Edwards and others that "Kevin likes to break the rules"; and
>
> (7) Jackson stated to a peer on August 11, Edwards's day off, "What's he wearing? Pajamas?," when looking at Edwards.

(*Id.* at 2–3.)  The September 27 complaint includes all the above allegations, in addition to the

following alleged interactions:

> (8) On a Wednesday in late July or early August, Jackson, standing with Miller, asked Edwards to check to make sure there was nothing left in the van, and when Edwards looked around the van to double check and grab some leftover trash, Jackson said "We're over here laughing at you";
>
> (9) On August 6, Jackson "scoffed" at Edwards and stated, "You don't have the right to silence during an internal investigation" in a way that "seemed sarcastic and arrogant" to Edwards;
>
> (10) On August 11, Jackson "was staring at [Edwards] with an intimidating facial expression while I was sharing my opinion that we should allow intoxicated people to attend meetings as long as they aren't disruptive"; and
>
> (11) In mid-August, in the context of explaining that she fixes and resells houses, Jackson told Edwards she likes "playing in dirt" and that's why she works at the SEE.

Edwards does not explain in these internal complaints, or even in his summary

judgment response brief, how any one of these alleged interactions gave rise to an objectively

reasonable belief that Jackson was engaging in *racial* discrimination or contributing to a *race-*

*based* hostile work environment.[27]  *See Nnadozie v. Manorcare Health Servs., LLC*, No. CV BPG-

15-391, 2019 WL 1239874, at *8 (D. Md. Mar. 15, 2019), *aff'd*, 792 F. App'x 260 (4th Cir. 2019)

(finding no objectively reasonable belief and thus no protected activity where "plaintiff points

only to her supervisor's race and produces no evidence that the supervisor's actions were

---

[27] Edwards also mentions how, "[a]pparently, other staff members have complained to Cory Will and Daniel Rammel about Patrice Jackson's inappropriate/unacceptable behavior in the past."  (Dkt. 33-36 at 15; *see* Second Edwards Decl. ¶ 13 (noting how coworkers Legarreta and Bost had expressed concerns to Edwards "about Jackson and Rammel's behavior").)  Still, this does not contribute to a reasonable belief because Edwards does not provide any source of the rumors, nor do the rumors contain any specific allegations of Jackson engaging in racially discriminatory behavior. *See Espinoza*, 509 F. App'x at 734 (10th Cir. 2013) (refusing to find an objectively reasonable belief that plaintiff had "experienced discrimination because he had heard rumors," especially when he "could not recall where he heard the rumors").

racially motivated and not merely rude behavior"); *Sanders v. Tikras Tech. Sols. Corp.*, 725 F. App'x 228, 230 (4th Cir. 2018) ("But there is no evidence that connects any untoward behavior or comments with any form of racial or gender discrimination, and therefore [plaintiff's] subjective belief that her supervisor was acting with discriminatory intent was not objectively reasonable.").

The only other allegation that could potentially be construed as race-related is Edwards's statement that Jackson "heatedly explain[ed] how her hometown was more country than Culpeper and that I should go ask Gaelen the definition of a redneck and then come back to her to compare his definition of a redneck with her definition of a redneck." (Dkt. 33-28 at 2; Dkt. 33-36 at 12–13.) But again, this statement does not imbue a reasonable belief that Edwards was subjected to racial discrimination. Nor does Edwards explain how it could contribute to his reasonable belief. While Jackson's alleged statement includes the term "redneck," which could be construed as race-related, this term was not even directed towards Edwards—or used to describe any other employee, for that matter. Nor did it imply that Jackson was in any way discriminating against Edwards based on his race. *See Verrinder v. Rite Aid Corp.*, No. 3:06-cv-00024, 2007 WL 4357595, at *5 (W.D. Va. Dec. 11, 2007) (holding that there was no Title VII claim where, "[a]lthough [plaintiff's coworker's] language was undeniably offensive, it did not refer to Plaintiff and was not directed at him"); *Robinson v. Nielsen Co.*, No. 3:10-cv-00009, 2011 WL 6012512, at *7 (E.D. Va. Dec. 1, 2011) ("Isolated comments of a racial nature, even if from a supervisor, are not enough to give rise to an objective good faith belief that the employee is opposing an unlawful employment practice.").

*ii.*     *Reasonableness of Belief: Race-Based Hostile Environment Claim*

Edwards also fails to show that there are any genuine disputes of material fact about whether he had an objectively reasonable belief that he was experiencing a hostile work environment when he filed the September complaints. To assess the reasonableness of an employee's belief that he is subject to a hostile environment, the court "examine[s] the elements of a hostile environment claim in light of what [he] knew." *Strothers*, 895 F.3d at 328. The elements of a hostile work environment claim are: "(1) unwelcome conduct; (2) that is based on the plaintiff's [protected status]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011).

The second element requires that the offending conduct be based on the plaintiff's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. Title VII only prohibits actions in the workplace "that occur 'because of' one of the protected statuses." *Strothers*, 895 F.3d at 329. "In determining whether offensive conduct can be attributed to discrimination against the employee's race or other protected status, courts must view the behavior in light of the social context surrounding the actions." *Id.*

For the reasons delineated above in the court's analysis of Edwards's objectively reasonable belief that he was experiencing racial discrimination, *see supra* Section III.A.3.i, there is no genuine dispute of material fact. Edwards omits any explanation as to how Jackson's or Encompass's conduct, in light of the surrounding social context, could reasonably be perceived as *discriminatory* towards a protected class. *See Boyer-Liberto*, 786 F.3d at 284

- 44 -

(evaluating "whether the *discriminatory conduct*," not just any hostile or harassing conduct, "is physically threatening or humiliating, or a mere offensive utterance" such that there is a hostile environment (emphasis added)).    Unlike cases in which the court found plaintiff has a reasonable belief that a hostile work environment is underway, Edwards only complains of untoward comments, facial expressions, and body language from Jackson, all of which lack indication that she was acting in such a way or discriminating against Edwards *because of his race*. *See Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 336 (4th Cir. 2010) (holding plaintiff had insufficient evidence to survive summary judgment on her Title VII race-based hostile work environment claim where another peer "did openly disparage Mexicans," but "his repugnant remarks were made only two times in five months and, although not dispositive, his remarks were also never directed at [plaintiff]"); *see also Byrnes*, 662 F. App'x at 291 ("Harassing someone because he is a racist . . . is not the same as harassing someone because of his race."); *cf. id.* at 285 (finding a reasonable belief that a hostile work environment was in progress when plaintiff's manager twice called plaintiff a racial slur that was "degrading and humiliating in the extreme" amid yelling and threats (citation omitted)).    Instead, Edwards's complaints allege nothing more than "[r]ude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor," which are all "not actionable under Title VII."    *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019) (cleaned up).

Overall, neither the September 7 nor the September 27 complaint report behavior that Edwards could reasonably believe constitutes racial discrimination or a race-based hostile work environment in progress.    Nor do any other surrounding circumstances known to

- 45 -

Edwards at the time he filed these September complaints justify a reasonable belief that he was experiencing a race-based hostile work environment or racial discrimination. Instead, his September complaints are merely "general complaints of unfair treatment." *See Hemphill*, 975 F. Supp. 2d at 560; *Ghumman v. Boeing Intel. & Analytics, Inc.*, No. CV SAG-23-3371, 2024 WL 3554964, at \*3 (D. Md. July 24, 2024) (dismissing a Title VII retaliation claim for failure to show protected activity because "Plaintiff has not alleged that her multitude of reports of 'harassment' or 'discrimination' to her higher level supervisors ever referenced discrimination on the basis of her race or color"); *Burgess*, 466 F. App'x at 282 ("Our cases hold that an employee's complaint constitutes protected activity when the employer understood, or should have understood, that the plaintiff was opposing discriminatory conduct."); *see also Workman*, 2025 WL 474923, at \*5 ("[T]he plaintiffs may not stand on their ignorance of the substantive [Title VII] law to argue that their belief was reasonable." (quoting *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1312 (11th Cir. 2002)). Thus, to the extent that Edwards's claims allege retaliation stemming from his September discrimination complaints, such claims fail as a matter of law.

### 4. Retaliation Complaints: September 27, October 4 & October 23

Edwards's September 27, October 4, and October 23 complaints each assert that Encompass retaliated against him for submitting a discrimination complaint against Jackson. (*See* Dkt. 33-36 at 15–16; Dkt. 33-39; Dkt. 33-47.) Like the discrimination complaints, these retaliation complaints only constitute protected activity "if, at the time of their complaint, [Edwards] '[had] an objectively reasonable belief in light of all the circumstances that a Title

VII violation has happened or is in progress.'" *Strothers*, 895 F.3d at 327 (quoting *Boyer-Liberto*, 786 F.3d at 282).

Edwards's internal complaints of retaliation fail to constitute protected activity for many of the same reasons that Edwards's discrimination complaints are not protected activity. His September 27 internal complaint and both of his October internal complaints reported retaliation for complaining about Jackson's discrimination. (*See* Dkt. 33-36 at 4, 15–16; Dkt. 33-39; Dkt. 33-47.)   But because Edwards had no objectively reasonable belief that he was being discriminated against on the basis of race in the first place, he also could not have reasonably believed that a violation of 42 U.S.C. § 2000e–3(a), the antiretaliation provision, was in progress.  *See Laughlin*, 149 F.3d at 259 (holding that Title VII's antiretaliation provision prohibits an employer from "tak[ing] adverse employment action against an employee for opposing *discriminatory practices* in the workplace" (emphasis added)); *Hurtt v. Baltimore Cnty.*, No. CIV. JKB-12-445, 2014 WL 583008, at *7 (D. Md. Feb. 10, 2014) ("This Court has found no basis whatsoever for [plaintiff] to assert charges of discrimination against Defendants. Consequently, she lacked an objectively reasonable belief that she was actually being subjected to unlawful harassment, and her claim of retaliation fails."); *Cobbs v. Bottling Grp., LLC*, No. 4:11-cv-00011, 2011 WL 6402187, at *6 (W.D. Va. Dec. 21, 2011), *aff'd*, 474 F. App'x 178 (4th Cir. 2012) ("In order to succeed on a claim of retaliation based on a complaint, the complainant must have complained about an act that could objectively be thought to be discrimination.").

District courts in the Fourth Circuit have previously looked at whether a plaintiff's earlier discrimination complaints constitute protected activity to determine whether their subsequent internal *retaliation* complaint is protected.  In *Dufort v. Liberty University*, on a motion

for reconsideration, this court rejected that plaintiff's internal complaint "about the retaliatory hostile work environment she experienced" following her earlier internal discrimination complaint constituted Title VII protected activity. No. 6:21-cv-00054, 2023 WL 2776066, at *3 (W.D. Va. Apr. 4, 2023). In so deciding, it explained that her internal retaliation complaint could not be protected activity because her first internal discrimination complaint was about treatment of a student rather than an employee, and thus did not fall within the ambit of Title VII. *Id.* Like in *Dufort*, because Edwards's earlier discrimination complaints were not protected activity, his later retaliation complaints also fall short. Edwards did not have an objectively reasonable belief that he had previously opposed an unlawful employment practice under Title VII via his September complaints, such that he now faced Title VII retaliation.

In his response brief, Edwards did not address Encompass's argument that these internal retaliation complaints are not protected activity. (*See* Def.'s Br. at 21.) When prompted by the court's order for supplemental briefing, he still failed to explain or cite evidence showing a genuine dispute of material fact. *See Crawford v. Newport News Indus. Corp.*, No. 4:14-cv-00130, 2018 WL 2943445, at *18 (E.D. Va. June 11, 2018) ("[T]he court is not required to sift through the record searching for evidence to support opposition to summary judgment."). In his supplemental brief, Edwards cited three bases for his objectively reasonable belief: (1) that he consulted an attorney who discussed retaliation claims with him; (2) that he extensively researched retaliation law under EEOC guidance and matched retaliation to conduct he was experiencing; and (3) that he observed a pattern of adverse actions following each internal complaint. (Pl.'s Supp. Br. at 6–9 (Dkt. 39).)

- 48 -

First, Edwards does not properly support his attorney consultation or personal research arguments with evidence from the summary judgment record.  He cites nothing for his assertion that he conducted extensive research.  For his assertion that he consulted an attorney, his only citation to the record invokes one of his two declarations, which he uses to argue that he had an objectively reasonable belief because the attorney "confirmed Edwards had a legal basis to file."  (*See id.* at 6 (citing Second Edwards Decl. ¶ 32).)  The cited portion of the declaration states:

> This discrimination and retaliation complaint was mailed via certified mail on September 26, 2022, after a consultation with an attorney on September 23, 2022, who specializes in employment law, including discrimination, harassment, and retaliation. (See 9-19-22 Payment to Attorney) The attorney advised me to provide an updated complaint to HR and to be explicit that it was under Title VII of the Civil Rights Act. He also advised me to file a complaint with the EEOC and the OCR.  Additionally, the attorney informed me that I may be able to resolve the matter with a settlement offer instead of filing a lawsuit.

(Second Edwards Decl. ¶ 32.)  Edwards's declaration says nothing about their discussion of retaliation in his case or the attorney's confirmation that Edwards's claims were actionable.  And even if it did, the fact that Edwards consulted an attorney about retaliation or researched Title VII law goes to his subjective belief, and it does not suffice to create a genuine dispute of material fact as to whether Edwards had an objectively reasonable belief of unlawful retaliation.

Edwards's third argument is similarly unpersuasive.  His discussion of the "pattern of adverse actions" may be relevant to whether he reasonably believed he had suffered adverse action under the antiretaliation provision of Title VII.  (Pl.'s Supp. Br. at 8.)  However, his belief does not tend to show whether he first had an objectively reasonable belief that he had

- 49 -

"opposed any practice made an unlawful employment practice" by Title VII.    42 U.S.C. § 2000e–3.

Moreover, the "internal emails" Edwards cites as evidence "confirm[ing] that the belief Edwards formed from observable facts was factually accurate," (Pl.'s Supp. Br. at 9), do not bolster the element of protected activity or Edwards's objectively reasonable belief.    For the protected activity element, the court determines whether the employee's perception of a violation is "objectively reasonable *under the circumstances known to [him]*."    *Strothers*, 895 F.3d at 328 (emphasis added) (cleaned up).    Thus, the cited emails between Encompass leadership, which Edwards does not claim he knew anything about while submitting his internal complaints, are irrelevant to the protected activity prong.

Edwards does not raise a genuine dispute of material fact as to whether his internal complaints about retaliation count as protected activity, especially when the underlying complaint does not constitute Title VII racial discrimination or hostile environment.    Title VII does not protect an employee from retaliation "based on [his] opposition to discriminatory practices that are outside the scope of Title VII."    *Buck v. Modine Mfg. Co.*, 776 F. Supp. 3d 357, 372 (W.D. Va. 2025).    Thus, under circumstances lacking evidence of any race-based discrimination or hostile environment, Edwards did not have an objectively reasonable belief that he was experiencing unlawful retaliation under Title VII.

### 5.    November 14 and 18 Complaints

Edwards's November complaints both notify management and HR personnel of Edwards's plans to file a charge of discrimination with the EEOC.    His November 14 email states that he "intend[s]" to "demand a jury trial" if Encompass "isn't willing to agree to a

reasonable settlement." (Dkt. 35-1 at 62.)  On November 18, he told Will in their supervisory meeting that he intended to pursue EEOC and OCR charges.  (*See* First Edwards Decl. ¶ 30.)

In both November complaints, Edwards did not specify any other allegations that he intended to include in his EEOC Charge that were not present in his earlier complaints.  In fact, he did not provide any specifics as to what allegations he planned to include in the Charge.  Nor are there any additional circumstances in the record suggesting Edwards had, in the time following his October 23 complaint, developed an objectively reasonable belief that a Title VII violation was underway.  Thus, assuming his allegations are the same as his earlier complaints, the court's analysis in the foregoing sections applies, and Edwards does not show any genuine disputes of material fact as to whether he had an objectively reasonable belief that he was subjected to unlawful Title VII practices.

* * *

Viewing the facts and drawing all reasonable inferences in the light most favorable to Edwards, none of his internal complaints give rise to an objectively reasonable belief that a Title VII violation had occurred or was occurring.  Because the court finds that no reasonable jury could conclude that Edwards engaged in protected opposition activity, a required element of his *prima facie* case, Edwards's Title VII retaliation claim fails, and Encompass is entitled to summary judgment.

## IV.    Conclusion

For the foregoing reasons, there are no remaining genuine disputes of material fact, and no reasonable jury could find for Edwards on his Title VII retaliation claim.  The court will **GRANT** Encompass's motion for summary judgment. (Dkt. 32.)

An appropriate Order will issue.

**ENTERED** this <u>22nd</u> day of July, 2026.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE